**RUSSELL**

v.

**TEXAS CONSOLIDATED OILS.**
**Civ. A. No. 2347.**

United States District Court,
D. New Mexico.
March 18, 1954.

Reese, McCormick, Lusk & Paine, Carlsbad, N. M., for plaintiff.

Johnson & Abney, Dallas, Tex., and Simms, Modrall, Seymour & Simms, Albuquerque, N. M., for defendant.

WALLACE, District Judge.

The plaintiff, C. Earl Russell, a Massachusetts citizen, brings this action to recover the sum of $13,500 from the defendant, Texas Consolidated Oils, Inc., a Texas Corporation,[1] for commissions allegedly earned by the plaintiff while acting as a tax consultant in connection with the promotion of certain oil investment transactions. The amount sued for allegedly was earned while the plaintiff was working for one A. W. Smith at a time when Smith was promoting the sale of certain oil interests for Homer W. Snowden, general partner of Snowden Oil & Gas Co., Ltd. (herein referred to as Snowden, Ltd.) the legal predecessor of the defendant corporation.

Plaintiff urges that the defendant company is legally liable for these services rendered by plaintiff by virtue of the fact that said company in taking over all of the assets of Snowden, Ltd., agreed to assume all outstanding liabilities of said partnership; and, that at the time of this assumption, Snowden, Ltd. owed A. W. Smith for services rendered an amount of $30,000, $15,000 of which was assigned to plaintiff by Smith, the assignment of which was recognized by the defendant company.[2]

Stated generally, the issue before the Court is whether the defendant company is legally responsible for the indebtedness owed plaintiff by Smith because of an enforceable assignment to plaintiff of an obligation rightly owed Smith by the defendant company.

To resolve the instant issue it is desirable to evaluate the facts and circumstances surrounding the historical development of the defendant company, out of which condition the claim in question arose.

The evidence indicates that the previously mentioned Homer W. Snowden was the dominant and moving character behind a series of promotional schemes which encouraged numerous investors to purchase interests in certain oil and gas developments. The first deal in such series, insofar as pertinent to the case at bar, took place from July to December in 1945 and was referred to as the "Smith deal No. 1"; in this particular

---

1. A Texas corporation authorized to do business in New Mexico.

2. Although the claimed assignment to plaintiff was for $15,000 only $13,500 is sued for inasmuch as $1,500 was paid on this claim in November of 1948, by one Frank A. Hernberg, an associate and close friend of Snowden.

venture the participants paid a total cash consideration of some $2,600,000. Although subsequently it developed that Snowden had engineered a gigantic fraud in connection with this Smith deal No. 1 which fraud among other things included the dissemination of false information to prospective investors together with a sweetening of payments by means of funds from other sources to give this first deal the appearance of being extremely profitable, the patent success of this first venture stimulated considerable interest in two subsequent Snowden deals denominated "Smith deal No. 2" and "Smith deal No. 3".

The thirty participants in Smith deal No. 2 paid a total cash consideration of some $2,000,000; in this transaction, Snowden, Ltd. made direct assignments to each of the investors; subscriptions for this enterprise were taken between December 10, 1945, and about February 15, 1946.

Smith deal No. 3 was formed pursuant to an agreement dated April 1, 1946, between Snowden, Ltd., by Homer W. Snowden, general partner, and A. W. Smith (the plaintiff's alleged assignor) in which agreement for a cash consideration of $3,000,000 Snowden, Ltd. agreed to sell fifty per cent of the amount of the working interest held by Snowden, Ltd. in certain leases and to drill fourteen wells; this deal was subscribed between April and October of 1946. It was understood that Smith, the person responsible for most of the financing, was to receive a five per cent commission on all monies invested due to his efforts; such compensation was to come from the leasehold interests retained by Snowden and associates.[3]

Although there is no evidence in this record that Smith, or his agent, the plaintiff, were aware of any fraudulent representations, it appears that Snowden did actively and knowingly perpetrate a gigantic fraud on the investors in connection with all three of these deals.

Early in 1946 Texmass Petroleum Company (herein referred to as Texmass) was incorporated under the laws of Texas; ten per cent of the authorized capital stock was purchased by Snowden, Ltd. On November 1, 1946, Texmass issued seventy per cent more of its authorized capital stock to Snowden, Ltd., in exchange for the assets and liabilities of Snowden, Ltd.[4]

Through the exercise of certain options to purchase, apparently given by Snowden because of pressure from disgruntled security purchasers, said stockholder investors on June 5, 1947,[5] acquired 6120 shares (or 76½%) of the Texmass stock; this stock became treasury stock. In June of 1948 Mr. Snowden *donated* his remaining 1880 shares of Texmass stock to the corporation and relinquished control. When Snowden was thus forced to surrender control of Texmass and stepped down as president, such office was filled by a Mr. Morse until March 1, 1949, at which time the stockholders elected A. W. Smith as president and active head of the company. On May 22, 1950, the name of Texmass Petroleum Company was changed to Texas Consolidated Oils.

Insofar as the plaintiff's claim is concerned the evidence shows that on November 1, 1946, at the time Texmass assumed all of the outstanding liabilities of Snowden, Ltd., Smith (plaintiff's alleged assignor) did have a claim or chose in action against Snowden, Ltd., for commissions earned but not paid and the books of Texmass showed a liability to Smith of $30,000 for commissions.[6]

---

3. However, Smith did receive cash advances from Snowden and Snowden, Ltd., in the amount of $48,408, $30,000 of which was represented by a note payable from Smith to Snowden, Ltd.; it was understood such advances would be repaid from income from interests to be assigned to Smith as commissions.

4. The remaining twenty per cent of the authorized capital stock was never issued.
5. The transfer was effective as of May 29, 1947.
6. Apparently this $30,000 on the books for commissions earned and owed to Smith was a bookkeeping counterpart of $30,000 of the cash advanced to Smith and evi-

In April of 1947 the plaintiff prepared and had executed an instrument in letter form upon which the plaintiff's present cause of action rests; plaintiff urges that this instrument constituted an assignment to plaintiff of $15,000 of the $30,000 liability owed Smith by Texmass. This instrument provided as follows:

"Boston, Massachusetts"
"April    1947
"Mr. C. Earl Russell
"50 Congress Street
"Boston, Massachusetts
"Dear Mr. Russell:

"In consideration of sales assistance rendered to the Snowden Oil & Gas Co., Ltd. through A. W. Smith, I, as general partner of Snowden Oil & Gas Co., Ltd., hereby agree to. pay to you prior to December 31, 1947, the amount of $15,000 cash or to assign to you on or before that date an interest in producing oil wells which will give you an annual net yield at the outset of 25% of $15,000 or $3,750 per year.

"It is understood and agreed to by Mr. Smith that the above amount of cash or interest in oil wells is to be deducted from the total amount of sales compensation presently due Mr. Smith from the Snowden Oil and Gas Co., Ltd.

"It is also understood that the payment to you as stated above will be in full satisfaction of all sales assistance rendered to the Snowden Oil & Gas Co., Ltd. through A. W. Smith for the so-called Smith Deal No. 2 and the Smith Deal No. 3 which are the only Snowden deals for which you have not to date received compensation.

"This writing shall be considered a sealed instrument by all parties signing.

"(Signed) H. W. Snowden
"Homer W. Snowden, General Partner, Snowden Oil & Gas Co., Ltd.
"Agreed to by
"(Signed) A. W. Smith"

After careful consideration the Court has concluded that the just-quoted instrument did not amount to a legally enforceable assignment to plaintiff of the liability owed Smith by Snowden, Ltd. and assumed by the defendant company. .

Smith's chose in action against the defendant company, although listed on the books as a $30,000 liability was actually in the nature of a right to assignments of overriding royalties; this is shown by Smith's own testimony:[7]

"Without being reduced to any formality, it was my understanding that they would have some relationship (that is, the commissions to be paid Smith) to the 5% of the total amount of money that was raised, although it would not be possible to tie a value of an overriding royalty on a dollar consideration."

Thus, in reality, Smith's claim was limited to the recovery of overriding royalty interest in oil and gas leases and was not a claim for commissions payable in cash.

However, assuming the liability owed Smith was a debt in dollars the instrument in question did not attempt to assign a $15,000 cash interest to the plaintiff. Under the general canons of construction in regard to contracts which leave the Court free to determine just what the intention of the parties actually was, unrestricted by highly technical rules or theories of construction,[8] there is no implication that

---

[7]. Smith dep. p. 8.

denced by the note payable referred to in footnote 3, supra. This further explains the fact that Texmass in 1949 removed both accounts from its books; and, why Smith this same year reported an income of $30,000 from Texmass.

[8]. See Fuller v. Crocker, 1940, 44 N.M. 499, 105 P.2d 472; Marcelle, Inc. v. Sol. & S. Marcus Co., 1931, 274 Mass. 469, 175 N.E. 83, 74 A.L.R. 1012; Armstrong v. Humble Oil & Refining Co., Tex.Civ.App., 145 S.W.2d 692.

an *assignment* of Smith's interest was intended. The letter neither identified a specific or particular thing nor gave any indication of an attempt to bring about an actual and present transfer of title. It is of course fundamental that in order to effect a legal assignment there must be evidence of an intent to assign or transfer the whole or part of some specific thing, debt, or chose in action and the subject matter of the assignment must be described sufficiently to make it capable of being readily identified;[9] neither condition is present in the sued upon instrument.[10]

The Court has also considered, apart from the question of assignment, whether the instrument in question gave rise to a new obligation on the part of the defendant company.

Although it is the Court's impression that this April letter manifests more of an intention to create a new obligation than to specifically assign an identifiable existing one, this instrument did not create a new and distinct enforceable obligation on behalf of the defendant in favor of the plaintiff.

■ At the time of the signing of the letter agreement in question, even though Snowden was president of Texmass, the letter was signed "H. W. Snowden, General Partner, Snowden Oil & Gas Co., Ltd." Thus, even construing that this letter amounted to the creation of an obligation of Snowden, Ltd. on behalf of the plaintiff for the amount in question, such contracted liability by Snowden in April of 1947 could not legally bind the defendant company to pay this amount as if it were one of the liabilities of Snowden, Ltd. as of the date of the assumption by Texmass of the liabilities of Snowden, Ltd. on November 1, 1946, the date of this assumption. As the sole general partner of Snowden, Ltd., Snowden could not create a liability in April of 1947 on behalf of Snowden, Ltd., which in its effect dated back prior to November 1, 1946, so as to bring such liability under the Texmass assumption agreement.

■ Also, there is no convincing proof that Texmass itself directly contracted for this liability. Even though there be little need for proof of Snowden's authority to bind Texmass at the time the April letter agreement was executed, inasmuch as he was president and controlling stockholder, it is imperative to plaintiff's cause to establish that Snowden intended to bind Texmass to pay this amount. Such an intent has not been proved; in fact, all the evidence implies that Snowden did not intend to bind Texmass. As indicated by the plaintiff, himself, Snowden stated that plaintiff "was one of the boys that he wanted to take care of"[11] and, it is only logical that

---

9. Read, Novo Trading Corp. v. Commissioner of Internal Revenue, 2 Cir., 1940, 113 F.2d 320; Ingram v. Mandler, 10 Cir., 1932, 56 F.2d 994; 6 C.J.S., Assignments, § 44. Cf. Early & Daniel Co. v. Pearson, 5 Cir., 1929, 36 F.2d 732, certiorari denied 281 U.S. 738, 50 S.Ct. 334, 74 L.Ed. 1152; Illinois Powder Mfg. Co. v. Security Bank and Trust Co., 1935, 174 Okl. 293, 50 P.2d 411.

10. It is also significant that Smith, the alleged assignor, did not execute the written letter agreement, but merely signed his name under "Agreed to by". In addition, the subject matter of this letter agreement is in the form of a promise to do one of two alternative things; with such an alternative subject matter there can be neither an intent to immediately transfer the interest nor an ability to define the alleged object of assignment.

The construction placed on this instrument by the actions of the parties also runs somewhat contrary to the theory that this instrument was considered an assignment by Smith, accepted by Texmass. Although the Texmass prospectus shows that $1500 was paid to plaintiff this $1500 was actually paid by one Hernberg at a time when plaintiff was bringing pressure on Snowden for payment. See footnote 2 supra. This by implication indicates Snowden considered this obligation a personal one, inasmuch as although Snowden no longer had an interest in Texmass he apparently persuaded a close friend to advance this part payment.

11. Russell dep. p. 29.

Snowden was making some effort to personally see to it that the plaintiff was looked after; such is implied from the phrase in the letter agreement, "In consideration of sales assistance rendered * * * I, as general partner of Snowden Oil & Gas Co., Ltd., hereby agree to pay to you * * *". No inference is raised that Snowden intended to create an obligation on behalf of Texmass.[12]

The letter of July 22, 1947, written to the plaintiff and signed by "H. W. Snowden, President, Texmass Petroleum Company" cannot be interpreted to convert the April letter agreement into a Texmass obligation.[13] The reference in the July letter is not back to a prior *assignment* made in April, or even to a *new* written *obligation* entered into in April, but is restricted to the subject matter, "In accordance with our *oral agreement* * * *" and mentions terms which are inconsistent with the April letter agreement. The mere fact that Snowden wrote this letter in July on Texmass letterhead and signed the letter as an officer of Texmass does not in any way tend to establish that the April letter, the instrument sued upon, was executed by Snowden in his official capacity as an officer of Texmass.

In addition, even if the evidence established that Snowden, as President of Texmass, intended to contract as of April 1947 and to bind Texmass to pay the liability in question said agreement would be unenforceable for the reason that there is no consideration running from the plaintiff to the defendant to support such a contract. It is of course elementary that past consideration is not sufficient to support a contract, particularly where the benefit derived, if any, was enjoyed by a third person. According to the plaintiff's own testimony he was working for Smith and had no understanding, even indirectly that Snowden, Ltd. had directly contracted with him, prior to the April 1947 letter agreement.[14] Thus, the April letter agreement promise, if deemed a new promise rather than an assignment, to pay plaintiff, "In consideration of sales assistance *rendered* to the Snowden Oil & Gas Co., Ltd. * * *" could not bind even Snowden, and even more so could not bind Texmass. As observed in 12 Am.Jur. 586:[15]

12. Under the facts and circumstances in existence it is only reasonable that Snowden expressly avoided a loading of additional liabilities on the Texmass corporation in view of the increasing discontent on the part of investors and actually intended to somehow handle this matter himself.

13. The body of this letter provided: "In accordance with our oral agreement, I will assign to you, within one month from the above date, a sufficient interest in wells in Wood County, Texas, that will pay you a minimum of $300.00 per month. If possible, such interest will be of an overriding nature." Once again the general tenor of the letter which includes, "I will assign to you", indicates that Snowden personally was attempting to work out a satisfactory arrangement with plaintiff.

14. In fact the plaintiff's own testimony demonstrates the very loose knit understanding had even with Smith. Plaintiff testified, " * * * as far as A. W. Smith is concerned, as I have said, that I had no arrangement with Mr. Smith for a long time, except that he did say to me, 'Earl, I am going to take care of you for all the help you have given me' " (Russell dep. p. 23).

15. See Henderson & Dempsey v. Skinner, 1928, 146 S.C. 281, 143 S.E. 875, 59 A.L.R. 174; 17 C.J.S. Contracts, § 116, p. 470; 17 A.L.R. 1307 and cases cited therein.
   The recitation at the close of the April letter agreement that said agreement "shall be considered a sealed instrument by all parties signing" has no bearing on the question of lack of consideration. The effect of a seal is governed by the law of the forum inasmuch as it is a question of remedy. Nowell v. Waterman, 1932, 53 R.I. 16, 163 A. 402. See 109 A.L.R. 485 et seq.; and, the New Mexico legislature has settled this issue by specific legislation. "No seal or scroll shall be necessary to the validity of any contract, bond or conveyance, whether respecting real or personal property, or any other instrument of writing, except such as are made by corporations, *nor shall the addition or omission of a seal or scroll in any way affect the force or effect of the same*." (Emphasis supplied.) N.Mex.Stat.Ann. § 75–105.

"* * * it is a general rule that past consideration is insufficient to support a promise. Past detriment to the promisee without any benefit to the promisor—as, for instance, where the benefit is derived by a third person—is insufficient consideration. * * * A past detriment to the promisee with benefit only to a third person is insufficient even though the promisor is morally obligated to the person benefitted."

Although the defendant company has raised a number of other defenses[16] it is unnecessary to individually consider them in view of the Court's expressed opinion.

Counsel should submit a journal entry to conform with this opinion within 15 days.

16. For example: (1) that plaintiff violated the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq. by his failure to register thereunder as a broker and his use of instrumentalities of interstate commerce in connection with Smith deals No. 2 and 3 and therefore his recovery is barred by Section 29(b) of that Act; (2) that in violation of the Securities Exchange Act of 1934 plaintiff and Smith communicated false representations in respect to the securities sold and plaintiff is thereby barred from recovery by Section 29(b) of the Act; (3) that plaintiff's suit is on a contract made and performed in violation of the Securities Act of 1933, 15 U.S.C.A. § 77a et seq., and is therefore violative of public policy and unenforceable.